# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CLARICE FELDMAN,           )
                                 )
      Plaintiff,           )
                                 )
      v.                 )     No. 15-cv-1967 (KBJ)
                                 )
MURIEL E. BOWSER, *in her official*  )
*capacity as Mayor of the District of*  )
*Columbia, et al.,*          )
                                 )
      Defendants.      )
                                 )

## <u>MEMORANDUM OPINION</u>

The Local Budget Autonomy Amendment Act of 2012 ("the Budget Autonomy Act"), D.C. Law 19-321, 60 D.C. Reg. 1724 (Feb. 15, 2013), represents the culmination of decades of effort on the part of the government of the District of Columbia (the "District") to obtain greater budget autonomy by limiting the degree of congressional oversight over the manner in which the District enacts its annual budget and spends local tax and fee revenues.  In the instant action, Plaintiff Clarice Feldman claims that the Budget Autonomy Act improperly circumvents congressionally-mandated budget procedures, because it authorizes the District to adopt and implement a "local" spending plan as part of the municipality's annual budget without submitting that portion of the budget to the President and Congress for approval.  (*See* Compl., ECF No. 1, ¶¶ 12–24 (comparing the budgeting procedures that the Budget Autonomy Act prescribes with the congressionally-mandated procedures of the Home Rule Act, D.C. Code §§ 1-201.01 *et seq.*); *id.* ¶¶ 41–42 (alleging that the Budget Autonomy Act violates the procedures

prescribed in the Home Rule Act).)  By virtue of her status as a District of Columbia taxpayer, Feldman contends that she has Article III standing to file a federal lawsuit that challenges the Budget Autonomy Act and each of the annual fiscal year ("FY") budgets that the District has enacted pursuant to that Act from 2016 to the present. Feldman's one-count complaint requests a declaration that the Budget Autonomy Act and the local portion of the District's annual budgets are unlawful, and seeks an injunction that prevents defendants Muriel Bowser (in her official capacity as the District's Mayor) and Jeffrey DeWitt (in his official capacity as the District's Chief Financial Officer) (collectively, "Defendants") from incurring further obligations or making further expenditures of local taxpayer funds on those portions of the District's annual budget.  (*See id.* at 9.)[1]

Before this Court at present are the two motions to dismiss the complaint that Defendants have filed in this action.  (*See* Def. DeWitt's Mot. to Dismiss ("DeWitt's Mot."), ECF No. 9; Def. Bowser's Mot. to Dismiss ("Bowser's Mot."), ECF No. 10.)[2] As relevant here, both motions raise threshold challenges to Feldman's standing to bring this action.  For the reasons explained below, this Court agrees with Defendants that Feldman does not have standing to challenge the legality of the Budget Autonomy Act or the method by which the District allocates its funds to be expended for

---

[1] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

[2] The instant case was reassigned to this Court on July 15, 2016, after which the Court ordered the parties to file corrected briefs that conform with this Court's General Order and Guidelines for Civil Cases.  (*See* Min. Order of July 21, 2016; *see also* General Order & Guidelines, ECF No. 26.)  In this Memorandum Opinion, the relevant page-number citations to DeWitt's motion to dismiss and Feldman's opposition brief refer to these corrected filings.  (*See* Notice, ECF No. 27 (attaching DeWitt's corrected motion to dismiss); Pl.'s Notice of Modified Br., ECF No. 28 (attaching Feldman's corrected opposition brief).)

otherwise-lawful purposes. Accordingly, this Court concludes that it has no subject-matter jurisdiction to entertain Feldman's complaint, and thus, Defendants' motions to dismiss the complaint must be **GRANTED**. A separate Order consistent with this Memorandum Opinion will follow.

## I.    BACKGROUND

### A.    The Home Rule Act And The Budget Autonomy Act

Before the early 1970s, the Council of the District of Columbia did not exist, and the United States Congress "prepared and approved, in an appropriations act, a budget for the District" each year. James W. Moeller, *Congressional Management of the District of Columbia Prior to Home Rule: The Struggle to Underground Power Lines in the Nation's Capital*, 19 UDC L. Rev. 115, 116–17 (2016). Congress enacted the Home Rule Act in 1973, as a compromise between continued congressional oversight and District autonomy. The Home Rule Act granted "the people of the District of Columbia an opportunity in exercising their rights once more and yet with adequate safeguards for the Federal interest component." *Council of the Dist. of Columbia v. Gray*, 42 F. Supp. 3d 134, 139 (D.D.C. 2014), *vacated and remanded sub nom. Council of the Dist. of Columbia v. Bowser*, No. 14-7067, 2015 WL 3450417 (D.C. Cir. May 27, 2015) (internal quotation marks and citation omitted). As an initial matter, the Home Rule Act established the Council as the District's legislative branch. *See* D.C. Code § 1-204.01.[3] Moreover, Title IV of the Home Rule Act set forth the District's Charter, which "establish[es] the means of governance of the District[,]" *id.* § 1-203.01, and thus

---

[3] *See also* Council for the Dist. of Columbia, D.C. Home Rule, http://dccouncil.us/pages/dc-home-rule (last visited May 30, 2018).

essentially "serve[s] as a constitution[,]" *Jackson v. Dist. of Columbia Bd. of Elections & Ethics*, 999 A.2d 89, 123 (D.C. 2010). And just as with a state constitution, the District's Council can amend the Charter pursuant to a process set forth in the Home Rule Act. *See* D.C. Code § 1-203.03(a).

Significantly for present purposes, the Home Rule Act also authorized the District's Council to adopt an annual budget (including both locally-derived and federal funds), which the Mayor submitted to the President of the United States, who then forwarded that budget request to Congress for review as part of the national budget. *See id.* § 1-204.46 (2006); *see also Gray*, 42 F. Supp. 3d at 140. Notably, the Home Rule Act made clear that the budget that the District so proposed could not be put into effect, nor could any monies be obligated or expended pursuant to that budget, "unless such amount [was first affirmatively] approved by Act of Congress, and then only according to such Act." D.C. Code § 1-204.46 (2006).

In 2012, the District's Council undertook to amend the procedures that the Home Rule Act established with respect to the District's budget-implementing process. The Council unanimously passed a legislative proposal—the Budget Autonomy Act—which the District of Columbia's residents subsequently voted to ratify, and Congress ultimately let stand without expressing its disapproval. *See Gray*, 42 F. Supp. 3d at 142. (*See also* Bowser's Mot. at 15.) As enacted, the Budget Autonomy Act altered the Home Rule Act by removing the federal government from the budget-formulation and appropriation process for most District funds. Specifically, the Budget Autonomy Act bifurcated the District's annual budget into a "local" portion consisting of locally-derived funds (e.g., funds raised from local taxes imposed on District residents), and a

federal portion consisting of federally-derived funds (e.g., funds provided by Congress) (*see* Bowser's Mot. at 14), and as to the local portion, removed the President from the review process entirely, providing that, rather than having the Mayor submit the entire budget to the President to be presented to Congress, "[t]he local portion of the annual budget shall be submitted by the Chairman of the Council to the Speaker of the House of Representatives[,]" Budget Autonomy Act § 2(e). In addition, the Budget Autonomy Act established that Congress's review of the local portion of the District's proposed budget would be passive, rather than active. (*See* Bowser's Mot. at 14–15.) Thus, rather than requiring Congress to enact affirmative legislation *approving* the District's annual budget—as had been the process under the pre-amendment Home Rule Act—the Budget Autonomy Act permitted the local portion of the District's budget to take effect if, after a thirty-day review period, Congress did not pass a joint resolution *disapproving* of the District's spending plan. (*See id.*)

### B. Challenges To The Budget Autonomy Act

Several months after the July 2013 enactment of the Budget Autonomy Act, then-District of Columbia Attorney General Irvin Nathan formally advised then-Mayor Vincent Gray that he should not implement the Act, and should "advise Executive Branch officials and employees not to do so absent a binding judicial decision to the contrary." *Gray*, 42 F. Supp. 3d at 142 (internal quotation marks and citation omitted). In April of 2014, based on the Attorney General's recommendation, Gray and Defendant DeWitt (the District's Chief Financial Officer) advised the Council (1) that they believed the Act violated the Home Rule Act, the District's Charter, and other federal laws, (2) that any fiscal year budget had to be enacted pursuant to the pre-amendment provisions of the Home Rule Act, and (3) that, on Mayor Gray's watch, no

expenditures would be authorized pursuant to a budget that was enacted in accordance with the Budget Autonomy Act. *See id.* at 143. The Council disagreed with this assessment, and in response, sued Mayor Gray in D.C. Superior Court, seeking a declaration that the Budget Autonomy Act is valid and enforceable, and also an injunction requiring Gray and DeWitt to adhere to the Act's provisions. (*See* Compl. for Declaratory and Injunctive Relief, *Council of the Dist. of Columbia v. Gray*, No. 2014-CA-2371-B (Apr. 17, 2014).) That action was removed to this federal district, and on May 19, 2014, the Court (Sullivan, J.) ruled that the Budget Autonomy Act violated the Home Rule Act and the Anti-Deficiency Act, 31 U.S.C. § 1341, because, among other things, it exceeds the Home Rule Act's limits on the District's ability to alter the federal government's role in the District's budget. *See Gray*, 42 F. Supp. 3d at 138, 146.

The Council appealed the District Court's decision to the D.C. Circuit. *See Bowser*, 2015 WL 3450417, at *1. However, while that appeal was pending, Councilwoman Muriel Bowser was elected as the District's Mayor. (*See* Bowser's Mot. at 15–16.) Bowser supported the Budget Autonomy Act and intended to enforce it, and she therefore moved to dismiss the Council's appeal and vacate the District Court's judgment on grounds that the Mayor's office had changed its position in a manner that rendered the Council's legal claims moot. (*See id.* at 16.) The D.C. Circuit granted Bowser's request without explanation, and vacated the District Court's opinion with instructions to remand the case back to Superior Court. *See Bowser*, 2015 WL 3450417, at *1.

On remand, the parties were the Council and Bowser in support of the Budget Autonomy Act, and DeWitt still in opposition. On March 18, 2016, the Superior Court ruled that, in its opinion, the Budget Autonomy Act was lawful. (*See* Omnibus Order, *Council of the Dist. of Columbia v. DeWitt*, No. 2014-CA-2371-B (Mar. 18, 2016).) According to the Superior Court, the Act was a valid exercise of the District's authority to amend the Home Rule Act and the District's Charter largely because, by enacting the Home Rule Act, Congress had intended to delegate sweeping legislative authority to the District; because no provision of the Home Rule Act or the Anti-Deficiency Act preempted the Budget Autonomy Act; and because any ambiguities in the Home Rule Act had to be resolved the District's favor. (*See id.* at 16–37.) DeWitt did not appeal the Superior Court's decision.

## C.      Procedural History

Feldman filed the instant complaint on November 6, 2015, while the Council, Bowser, and DeWitt were still litigating the Budget Autonomy Act's legality in Superior Court. (*See generally* Compl.) Feldman alleges that "[t]he Budget Autonomy Act violates the Home Rule Act[,]" and that, "[b]y complying with the Budget Autonomy Act," the District is "incur[ring] illegal, unlawful, and *ultra vires* obligations of local taxpayer funds[,]" and "mak[ing] illegal, unlawful, and *ultra vires* expenditures of local taxpayer funds." (*Id.* ¶¶ 41–42.) Feldman appears to allege that section 446 is the specific provision of the Home Rule Act that the Budget Autonomy Act violates (*see id.* ¶¶ 17–19); pre-amendment, that section provided that "no amount may be obligated or expended by any officer or employee of the District of Columbia government unless such amount has been approved by Act of Congress, and then only

according to such Act." D.C. Code § 1-204.46 (2006). Feldman also argues (in her brief in opposition to Defendants' motions to dismiss) that "every dollar currently being spent is in violation of the Antideficiency Act[.]" (Pl.'s Opp'n to Defs.' Mots. to Dismiss ("Pl.'s Opp'n"), ECF No. 15, at 6.) The Anti-Deficiency Act prohibits, *inter alia*, "[a]n officer or employee . . . of the District of Columbia government" from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation[.]" 31 U.S.C. § 1341(a)(1)(A). "No private right of action for declaratory, mandatory[,] or injunctive relief exists under" the Anti-Deficiency Act. *Thurston v. United States*, 696 F. Supp. 680, 683 (D.D.C. 1988).

And while the complaint on its face challenges only the District's FY 2016 budget, Feldman has since clarified that her claims concern the budgets for 2016, 2017, and 2018. (*See* Tr. of Mot. Hr'g (Oct. 3, 2017) ("Hr'g Tr."), ECF No. 34, at 6:7–9 ("We're focused [on] every year since . . . 2016, [including] 2016, 2017[,] and now 2018, [which is] each budget . . . purportedly [passed] pursuant to the [L]ocal Budget Autonomy Act."); Pl.'s Not. of Dist. of Columbia's FY 2018 Budget Process, ECF No. 31, at 2 (requesting leave "to amend [the] Complaint to allege the forthcoming illegal expenditure of taxpayer funds pursuant to the [FY] 2018 budget").)[4] Feldman also

---

[4] For purposes of this Memorandum Opinion, the Court will construe the complaint as challenging each annual budget from 2016 to the present. However, notably, the parties disagree as to whether the FY 2016 budget was actually enacted pursuant to the procedures set forth in the Budget Autonomy Act or the pre-amendment procedures of the Home Rule Act. (*Compare* DeWitt's Mot. at 12 n.6 ("[A]s the District has shown, the [FY 2016] budget was submitted in full compliance with the Home Rule Act.") *and* Bowser's Mot. at 24 ("In passing the [FY 2016] budget, District lawmakers unequivocally complied with [the] requirements [of the Home Rule Act].") *with* Pl.'s Opp'n at 22 ("At a minimum, there is a factual dispute that cannot be resolved on this motion or without jurisdictional discovery.").) For purposes of this Memorandum Opinion, which addresses Defendants' motions to dismiss, the Court accepts Feldman's position that the FY 2016 budget was enacted pursuant to the Budget Autonomy Act.

claims that the District's alleged "illegal, unlawful, and *ultra vires* actions [in enacting these budgets] have injured and are injuring Plaintiff irreparably in her interests as a taxpayer and will continue to injure Plaintiff irreparably unless and until Defendants are enjoined from incurring such obligations and making such expenditures or otherwise ordered to cease and desist." (Compl. ¶ 43.)

In their motions to dismiss, Defendants argue, *inter alia*, that Feldman cannot proceed because her status as an individual District taxpayer does not give her standing to bring what is essentially a policy-based challenge to the Budget Autonomy Act and the annual budgets passed under the Act's amended procedures. (*See* DeWitt's Mot. at 11–15; Bowser's Mot. at 17–22.) In her opposition brief, Feldman maintains that she has identified an unlawful expenditure pursuant to the Budget Autonomy Act, as is required for municipal taxpayer standing, because she has challenged the *entire* local portion of the budget, and *all* expenditures pursuant thereto. (*See* Pl.'s Opp'n at 14–17.)

This case was originally assigned to Judge Emmet Sullivan pursuant to a notice of related case that Feldman filed in which she represented that the instant case was related to the prior litigation between the Council, then-Mayor Gray, and DeWitt. (*See* Notice of Related Case, ECF No. 2 (contending that the instant case is related to *Gray*, 42 F. Supp. 3d 134).) Bowser objected to the related-case designation (*see* Def. Bowser's Obj. to Pl.'s Notice of Related Case, ECF No. 11), and on July 14, 2016— after both of the instant motions to dismiss were already fully briefed (*see* DeWitt's Mot.; Bowser's Mot.; Pl.'s Opp'n; Def. Bowser's Reply in Supp. of Mot. to Dismiss ("Bowser's Reply"), ECF No. 19; Def. DeWitt's Reply, ECF No. 20)—Judge Sullivan

determined that Feldman's case was not related to *Gray* under this Court's local rules (*see* Min. Order of July 14, 2016). The instant case was randomly reassigned to this Court the next day, and the Court heard the parties' oral arguments regarding the motions to dismiss during a motion hearing held on October 3, 2017.

## II.     LEGAL STANDARDS

### A.     Motions To Dismiss For Lack Of Standing Under Rule 12(b)(1)

Article III of the Constitution limits the judicial power of the federal courts to "[c]ases" and "[c]ontroversies[,]" U.S. Const. art. III, § 2, and that limitation creates a jurisdictional requirement that a plaintiff have standing to sue, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Because it is a plaintiff's burden to demonstrate that the court has subject-matter jurisdiction over her claims, "[e]very plaintiff in federal court bears the burden of establishing the three elements that make up the 'irreducible constitutional minimum' of Article III standing: injury-in-fact, causation, and redressability." *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012) (quoting *Defs. of Wildlife*, 504 U.S. at 560–61); *see also Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*, 70 F. Supp. 3d 327, 340 (D.D.C. 2014) ("[T]he plaintiff bears the burden of establishing the existence of jurisdiction by a preponderance of the evidence.").

Courts consider motions to dismiss a complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1). *See, e.g.*, *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 48 (D.C. Cir. 2016). When evaluating whether or not a plaintiff has established the three elements of standing, courts must be mindful of the stage of the litigation, because "each element must be supported in the same way as any other

matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Defs. of Wildlife*, 504 U.S. at 561 (citation omitted); *accord Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912–13 (D.C. Cir. 2015). Thus, at the pleading stage, "a complaint must state a plausible claim" that the elements of standing are satisfied, *Humane Soc'y of U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015) (citations omitted), and when deciding whether or not a plaintiff's assertion of standing is plausible, "the court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff," *Cal. Clinical Lab. Ass'n v. Sec'y of Health & Human Servs.*, 104 F. Supp. 3d 66, 74 (D.D.C. 2015). However, "the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Austin-Spearman v. AARP & AARP Servs. Inc.*, 119 F. Supp. 3d 1, 8 (D.D.C. 2015) (internal quotation marks and citation omitted). In addition, "those factual allegations receive closer scrutiny than they would in the Rule 12(b)(6) context." *Jeong Seon Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (internal quotation marks and citation omitted).

Finally, while reviewing a motion to dismiss pursuant to Rule 12(b)(1), "it has been long accepted that the judiciary may make appropriate inquiry beyond the pleadings to satisfy itself on authority to entertain the case." *Dalley v. Mitchell Rubenstein & Assocs., P.C.*, 172 F. Supp. 3d 6, 11 (D.D.C. 2016) (quoting *Hasse v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)).

## B.    Municipal Taxpayer Standing Doctrine

As a general matter, it is well established that an individual's status as a federal or state taxpayer does not convey Article III standing to challenge the expenditure of taxpayer funds, because "the interest of a [] taxpayer in seeing that [] funds are spent in accordance with the Constitution does not give rise to the kind of redressable 'personal injury' required for Article III standing." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007).  This is so because a plaintiff must make a showing that "he has sustained or is immediately in danger of sustaining some direct injury[,] . . . and not merely that he suffers in some indefinite way in common with people generally." *Id.* (quoting *Frothingham v. Mellon*, 262 U.S. 447, 488 (1923)).  And an individual taxpayer ordinarily cannot claim that, "having paid lawfully collected taxes into the Federal Treasury at some point, [she] ha[s] a continuing, legally cognizable interest in ensuring that those funds are not used by the Government in a way that violates the Constitution[,]" which is another way of saying that that "type of interest is too generalized and attenuated to support Article III standing."  *Id.* (emphasis omitted); *see also id.* at 598 ("The constitutionally mandated standing inquiry is especially important in a case . . . in which taxpayers seek to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens." (internal quotation marks and citation omitted)); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006) ("The [] rationale for rejecting federal taxpayer standing applies with undiminished force to state taxpayers.").

However, there is one circumstance in which the Supreme Court has recognized that a taxpayer may suffer a sufficiently particularized injury to qualify for Article III

standing to sue the governmental entity that allegedly mishandled the public fisc.

Unlike taxpayers whose money supports federal and state governments, the Supreme

Court has concluded that *municipal* taxpayers are sufficiently close to the budgeting

decisions that city governments make that they can sustain particularized, redressable

injuries as a result of those spending decisions, but only if they seek to "challeng[e] a

specific expenditure of public funds" on the grounds that public money has been "used

unlawfully" by a city government. *D.C. Common Cause v. District of Columbia*, 858

F.2d 1, 8–9 (D.C. Cir. 1988) (quoting *Doremus v. Bd. of Educ. of Borough of*

*Hawthorne*, 342 U.S. 429, 434 (1952)). The Supreme Court first explicitly recognized

the distinction between federal taxpayer standing and municipal taxpayer standing in

1923, when it observed that a federal taxpayer's "interest in the moneys of the treasury

. . . is shared with millions of others, is comparatively minute and indeterminable, and

the effect upon future taxation, of any payment out of the funds, so remote, fluctuating

and uncertain," that an individual's status as a federal taxpayer "afforded [no basis] for

an appeal to the preventive powers of a court of equity." *Frothingham*, 262 U.S. at 487.

By contrast, "[t]he interest of a taxpayer of a municipality in the application of its

moneys is direct and immediate and the remedy by injunction to prevent their misuse is

not inappropriate." *Id.* at 486. Consequently, the Supreme Court acknowledged the

Article III standing of "resident taxpayers [who] sue to enjoin an illegal use of the

moneys of a municipal[ity.]" *Id.*

Relying on *Frothingham*, the D.C. Circuit observed almost thirty years ago that

"[t]he distinction between federal and municipal taxpayer standing retains its vitality."

*Common Cause*, 858 F.2d at 3. But it is clear that a plaintiff who claims an injury in

her capacity as a municipal taxpayer does so under a *narrow* exception to the general principles of standing law; she must purport to bring "a good-faith pocketbook action." *Id.* at 4 (quoting *Doremus*, 342 U.S. at 434); *see also Nichols v. City of Rehoboth Beach*, 836 F.3d 275, 280–81 (3d Cir. 2016) ("Though a municipal taxpayer may, in some cases, challenge municipal expenditures, her right to do so is not unlimited[, and w]e have applied the 'good-faith pocketbook' requirements, articulated by the Supreme Court in *Doremus*, to municipal taxpayer standing."). Thus, in order to satisfy "the injury requirement" of standing, the "municipal taxpayer [must] establish that the challenged activity involves a measurable appropriation or loss of revenue," and that "tax moneys are [actually being] spent" on that inappropriate activity. *Common Cause*, 858 F.2d at 4–5; *see also Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 210 (6th Cir. 2011) (en banc) ("[M]unicipal taxpayers may fulfill the injury requirement by pleading an alleged misuse of municipal funds."). Therefore, as "carefully defin[ed]" in this circuit, the "injury" to a municipal taxpayer for standing purposes is "the misuse of public funds[.]" *Common Cause*, 858 F.2d at 5.

What is more, a plaintiff claiming standing to sue as a municipal taxpayer "must also establish that the challenged action caused the injury[,] and that the injury would be redressed by a favorable decision." *Id.* (citation omitted); *see also Smith*, 641 F.3d at 209. And where the alleged injury to the taxpayer is "the misuse of municipal funds[,]" the causation and redressability requirements demand a showing that, "[b]y enjoining an illegal expenditure, the court can redress the taxpayer's injury caused by the misuse of public funds and ensure that the funds will be devoted [only] to lawful purposes of possible benefit to the taxpayers." *Common Cause*, 858 F.2d at 5; *see also*

*Smith*, 641 F.3d at 215 (adopting *Common Cause's* characterization of the "causation and redressability" prongs of municipal taxpayer standing as "persuasive").  Indeed, courts in this jurisdiction recognize a municipal taxpayer's standing only if she "has shown that the challenged program involves a measurable appropriation of public funds," and that the "misuse of public funds" will be "redressed by an order prohibiting the expenditure."  *Common Cause*, 858 F.2d at 5.

## III.   ANALYSIS

Instead of claiming that the District has made "a specific expenditure of public funds" for an unlawful purpose, *id.* at 8, or otherwise "misuse[d] [] public funds[,]" *id.* at 5, Feldman seeks to challenge the *method* by which the District enacts its budget, and says that the expenditure of *any* funds pursuant to this allegedly unlawful methodology—even funds expended for lawful purposes such as fighting fires, policing crime, and educating children—is *ipso facto* unlawful due to the previously mandated procedural steps that the District omitted when it enacted the local portion of its annual budget in accordance with the Budget Autonomy Act (*see* Pl.'s Opp'n at 16 ("Plaintiff's lawsuit . . . challenges *all* expenditures being made and *all* obligations being incurred pursuant to the process established by the Budget Autonomy Act." (emphasis added))).  According to Feldman, "[t]he injury is the D.C. government refusing to follow the rule of law" by allocating funds under the Budget Autonomy Act "and spending money it's not allowed to spend."  (Hr'g Tr. at 9:19–21.)  But as Defendants rightly note, Feldman "asks this Court to shut down the District government and nearly everything it does" (Bowser's Reply at 6), without maintaining that the District has expended a single penny to fund an unlawful program, practice, or activity.  For the reasons explained

below, existing taxpayer standing doctrine does not stretch that far, and this Court sees no basis for concluding that any such expansion is warranted.

A.     **Municipal Taxpayer Standing Requires That The Taxpayer Challenge A Discrete Expenditure Of Municipal Funds For An Unlawful Purpose**

As explained above, courts in this circuit and elsewhere have required taxpayers challenging the alleged misuse of public municipal funds to identify a discrete expenditure of funds for an allegedly unlawful purpose, and also to demonstrate that stopping the expenditure will ensure that public funds will only be used for lawful purposes of possible benefit to taxpayers. And Feldman is wrong to suggest otherwise. (*See, e.g.*, Pl.'s Opp'n at 16 ("Plaintiff is challenging each obligation being incurred and every taxpayer dollar being expended by Defendants.").)

The plaintiffs in *Common Cause*, for example, included three individuals who claimed standing as District of Columbia taxpayers to challenge allegedly illegal expenditures that the District had made to influence the outcome of a voting initiative. *See* 858 F.2d at 2. According to the plaintiffs, the District had unlawfully expended municipal funds in furtherance of publicity and propaganda when it "spent nearly $7,000" and "distributed pamphlets, flyers, and posters" to oppose the initiative. *Id.* at 2–3. The D.C. Circuit "conclude[d] that the individual [plaintiffs] . . . met the burden of establishing their standing, as municipal taxpayers, to challenge the District's use of public funds to oppose the initiative[,]" *id.* at 3, because the taxpayers had "challeng[ed] *a specific expenditure* of public funds" and requested "an injunction against" any future "misuse of public funds" *for that allegedly unlawful purpose*—i.e., "an injunction against the use of public funds by the District to campaign against [voter] initiatives[,]" *id.* at 8 (emphasis added). The Circuit further explained that the

alleged "injury—the District's future misuse of public funds—will be redressed by an injunction prohibiting such expenditures" by "ensur[ing] that [the plaintiffs'] taxes are not used . . . in the future to advance political objectives [the plaintiffs] may oppose, but only for lawful purposes of potential benefit to them as taxpayers." *Id.* at 9. Other courts have similarly required municipal taxpayers to allege that public funds were *actually* expended for some specified unlawful purpose. Where the plaintiffs had "failed to establish that the Township has spent any money, much less money obtained through property taxes, on the religious elements" of a particular display, for example, the Third Circuit rejected an Establishment Clause challenge to a township's holiday display, because the plaintiffs had not "carried their burden of proving an expenditure of revenues to which they contribute that would make their suit 'a good-faith pocketbook action.'" *ACLU-NJ v. Twp. of Wall*, 246 F.3d 258, 263–64 (3d Cir. 2001) (quoting *Doremus*, 342 U.S. at 434); *see also, e.g.*, *Am. Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist. RE-1*, 859 F.3d 1243, 1260 (10th Cir. 2017) (rejecting municipal taxpayer standing "[b]ecause plaintiffs have not shown evidence of a specific, measurable municipal expenditure on the challenged conduct" (i.e., allegedly promoting Christian religion in the county's public schools)); *Clay v. Fort Wayne Cmty. Sch.*, 76 F.3d 873, 879 (7th Cir. 1996) (finding plaintiffs "lack[ed] standing as municipal taxpayers" because they "failed to raise any specific challenge to an unlawful expenditure of municipal funds[,]" and "[m]unicipal taxpayer status does not confer standing absent some allegation by the plaintiffs of an illegal use of tax revenues").

By contrast, the law does not support Feldman's contention that a municipal taxpayer has standing to challenge the lawfulness of the overall *method* or *process* by

which the city government allocates funds or makes expenditures that are otherwise entirely lawful. Indeed, it is the *outcome* of the budgeting process—i.e., the municipality's expenditure of taxpayer funds for unlawful purposes rather than lawful ones—that actually implicates a taxpayer's fiscal interests, *see Common Cause*, 858 F.2d at 4–5, and purely process-based claims are ballot-box issues that do not cause cognizable injuries to taxpayers and cannot be adequately redressed in a federal court. *Cf. Brown v. Hansen*, 973 F.2d 1118, 1122 (3d Cir. 1992) ("Under [the political question] doctrine, courts generally refuse to scrutinize a legislature's choice of or compliance with internal rules and procedures."). A relatively recent Third Circuit decision underscores this point. In *Nichols v. City of Rehoboth Beach*, 836 F.3d 275 (3d Cir. 2016), a taxpayer sought to challenge the city's use of $52.5 million in municipal funds to pay for "an ocean outfall project" that had been allocated and approved for expenditure through a special election. *Id.* at 277. The plaintiff claimed that the special election itself (and thus the resulting issuance of municipal funds) was unlawful because the method by which the election was conducted violated the Fourteenth Amendment. *See id.* at 277–78. But the circuit court rejected the plaintiff's claim that "she ha[d] standing to challenge the $52.5 million in municipal debt incurred by an allegedly unlawful special election[,]" because the plaintiff had "not challenged the *expenditure* of the $52.5 million" as unlawful. *Id.* at 279 (emphasis added). Significantly for present purposes, the *Nichols* court made clear why the plaintiff's challenge did not present the kind of "good-faith pocketbook" claim that is required for municipal taxpayer standing: "[b]ecause the $52.5 million was not spent on an illegal practice[.]" *Id.* at 282; *see also id.* (emphasizing that "[t]he only expenditure that

Nichols can challenge is the cost of holding the special election—not the resultant issuance of bonds").

Stated succinctly, the Third Circuit appears to have recognized that, because the only cognizable injury to the taxpayer is that discrete public funds derived from her taxes were *misused* for some unlawful purpose, *see Common Cause*, 858 F.2d at 5 (defining the municipal taxpayer's injury as "the misuse of public funds"), a municipal taxpayer is without standing to challenge the process (budget-related or otherwise) by which expenditures are approved and made. Accordingly, it concluded that, where an allegedly deficient process results in funds being expended only for *lawful* purposes of potential benefit to taxpayers, there is no injury, and there is also nothing for the court to remedy.

This all means that, far from Feldman's vision of the municipal taxpayer doctrine, a plaintiff who claims standing to challenge a municipality's expenditure of public funds based solely on her status as a taxpayer must show that funds were actually expended for discrete identified, unlawful purposes—thus demonstrating that the expenditure injured her. *See id.* at 4 ("One commentator has interpreted [the municipal taxpayer doctrine] as requiring a taxpayer to challenge an activity involving an expenditure of public funds that would not otherwise be made."). Moreover, the municipal taxpayer plaintiff must show that, if the challenged activity were to cease, those otherwise-unlawfully-expended funds could be redirected toward some lawful purpose of potential benefit to the taxpayer—thus demonstrating that the injury is redressable. *See id.* at 5 ("By enjoining an illegal expenditure, the court [must be able to] redress the taxpayer's injury caused by the misuse of public funds and ensure that

the funds will be devoted to lawful purposes of possible benefit to the taxpayers."). And where the plaintiff fails to make the requisite showing, the plaintiff's claim must be dismissed for lack of standing. *See, e.g.*, *Freedom From Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1470 (7th Cir. 1988) (affirming dismissal for lack of municipal taxpayer's standing to challenge "allegedly unconstitutional display" in city park, because plaintiff "did not establish that the [city] has used tax revenues on the [display]"); *Patterson v. Rawlings*, 287 F. Supp. 3d 632, 642–43, 645 (N.D. Tex. 2018) (granting motion to dismiss for lack of standing where municipal taxpayer "failed to adequately plead that tax money was spent in connection with the [allegedly unlawful] removal of the [General Robert E.] Lee [s]tatue or any other Confederate monument"); *see also Pelphrey v. Cobb Cty., Ga.*, 547 F.3d 1263, 1280 (11th Cir. 2008) (stating that municipal taxpayer standing exists only where "the taxpayer . . . can establish that tax expenditures were used for the offensive practice[,]" such as the expenditure of public funds to offer invocational speakers in violation of the Establishment Clause).

### B. Feldman Has Not Alleged That Municipal Funds Are Being Expended For An Unlawful Purpose, And Therefore Seeks An Unwarranted Expansion Of The Municipal Taxpayer Standing Doctrine

Feldman's claims in the instant case resemble those that the Third Circuit rejected in *Nichols*—and must suffer a similar fate. Indeed, Feldman does not claim that the District has used any municipal funds to make illicit expenditures, and she fully acknowledges that her only basis for claiming that the District has unlawfully expended taxpayer funds is "[b]ecause of the process" by which the District allocates funds under the Budget Autonomy Act. (Hr'g Tr. at 6:21–22; *see also id.* at 15:20–16:2 (asserting that she is not challenging "where the money is going" or "how much money the [District] is allotting" to, for example, "the fire department, . . . the police department,

[or] . . . the teachers").)  Nor does Feldman purport to argue that the District would

have spent taxpayer money any differently if the challenged budgets had been approved

under the pre-amendment provisions of the Home Rule Act.  (*See id.* at 16:4–17:4.)

Thus, Feldman cannot proceed with the instant lawsuit.  *See Nichols*, 836 F.3d at

282 ("In order for a plaintiff to gain access to federal court using municipal taxpayer

standing, she must show that the municipality has actually expended funds on the

allegedly illegal elements of the disputed practice.").  Feldman's insistence that the

alleged unlawfulness of the budgeting process itself makes *every* dollar allocated

pursuant to the Budget Autonomy Act an unlawful expenditure (*see* Pl.'s Opp'n at 14,

16) finds no support in the case law, or the principles that undergird the municipal

taxpayer standing doctrine.  To the contrary, both make clear that what matters for the

purpose of establishing a cognizable injury to taxpayers is not the method by which city

officials undertake to make lawful expenditures that may well have been made even

absent the allegedly unlawful conduct, but the city's investment of taxpayer dollars on

things that are themselves unlawful, which qualifies as a waste of limited resources that

could otherwise have been spent to make legitimately beneficial expenditures.  *See*

*Common Cause*, 858 F.2d at 4–5.

Thus, it is clear beyond cavil that permitting Feldman's challenge would

"expand[ the] municipal taxpayer standing doctrine to encompass [a] far broader

category of challenges" (Bowser's Mot. at 18) than the sorts of "good-faith pocketbook

action[s]" contemplated in *Common Cause*, 858 F.2d at 4 (internal quotation marks and

citation omitted).  Indeed, Feldman apparently launched this action to advocate for

allowing municipal taxpayers to "[act as] Attorney[s] General and police the policies of

the District because they pay taxes here[.]" (Hr'g Tr. at 48:24–49:14.) But this Court is not persuaded that it should *expand* the reach of the narrow standing exception available to municipal taxpayers under *Frothingham* and *Common Cause*, and the Court is especially cautious in this case, given that no other court in this circuit has addressed municipal taxpayer standing in the thirty years since *Common Cause* was decided, much less affirmed a plaintiff's standing based on her status as a municipal taxpayer.[5]

## IV. CONCLUSION

There is presently a narrow window of opportunity for a municipal taxpayer claiming "misuse of funds" to proceed in federal court; Article III standing can be established if such a taxpayer challenges a discrete expenditure of public funds for an unlawful purpose, such that a court order enjoining the challenged expenditure will permit funds to be reallocated to lawful purposes of potential benefit to the plaintiff and other taxpayers. Feldman makes no such allegation. Instead, she seeks to challenge the

---

[5] For what it is worth, the Court notes that the tide appears to be turning against the recognition of municipal taxpayer standing in general. Even thirty years ago, some jurists expressed a concern that "[m]unicipal taxpayer standing appears on its face inconsistent with current principles of constitutional standing." *Common Cause*, 858 F.2d at 11 (Williams, J., concurring); *see also id.* at 12 ("[T]he evolution of standing doctrine has significantly undermined the original case for municipal taxpayer standing, however strong one may perceive that case."). And modern standing principles have continued to develop in the decades since, while the municipal taxpayer doctrine has not budged. In recent years, the Supreme Court has further constrained the ability of federal and state taxpayers to claim standing, based on its determination that any injury to a taxpayer "is not concrete and particularized, but instead" is "suffer[ed] in some indefinite way in common with people generally," and also "is not actual or imminent, but instead [is] conjectural or hypothetical." *Cuno*, 547 U.S. at 344 (internal quotation marks and citations omitted); *see also Hein*, 551 U.S. at 599 (roundly rejecting, as "too generalized and attenuated to support Article III standing[,]" the "interest of a federal taxpayer in seeing that Treasury funds are spent in accordance with the Constitution"). Moreover, to the extent that the rationale behind municipal taxpayer standing "appears to rest on the assumption that the relatively small number of taxpayers involved and the close relationship between residents of a municipality and their local government results in a direct and palpable injury whenever tax revenues are misused[,]" that assumption is tenuous at best in modern times; we have undoubtedly entered "an age in which some cities boast populations in the millions[.]" *Smith*, 641 F.3d at 210 (internal quotation marks and citation omitted); *see also id.* at 221 (Sutton, J., concurring) ("Whatever the virtue of a line between state- and municipal-taxpayer standing at its birth 88 years ago, the point of the demarcation is difficult to grasp today." (citation omitted)).

District's annual budget procedures, as prescribed in the allegedly unlawful Budget Autonomy Act, and she does not maintain that the illegal process has actually caused any funds to be expended for unlawful purposes. Thus, this Court concludes that Feldman has not brought a good-faith pocketbook action that can be pursued in federal court based solely on her status as a municipal taxpayer. Accordingly, and on that basis alone, Defendants' motions to dismiss will be **GRANTED** and Feldman's case will be dismissed, as set forth in the accompanying Order.

DATE: May 30, 2018

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge